# United States Court of Appeals
## For the First Circuit

Nos. 13-1525
    13-1683
    13-2420
    13-2460

UNITED STATES OF AMERICA,

Appellee,

v.

RUSSELL C. ROSE;
KELVIN FRYE,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Kayatta, Circuit Judges.

Rosemary Curran Scapicchio for appellant Kelvin Frye.
Jamesa J. Drake and Drake Law, LLC, for appellant Russell C.
Rose
Kirby A. Heller, Attorney, Appellate Section, Criminal
Division, U.S. Department of Justice, with whom Carmen M. Ortiz,
United States Attorney, James E. Arnold and David J. D'Addio,
Assistant United States Attorneys, District of Massachusetts,
Leslie R. Caldwell, Assistant Attorney General, and David A.

O'Neil, Acting Deputy Assistant Attorney General, Criminal Division, were on brief, for appellee.

_____

September 18, 2015

_____

**HOWARD**, **Chief Judge**.  Russell Rose and Kelvin Frye appeal convictions stemming from their respective roles in a Cape Cod based drug-distribution conspiracy.  Their claims challenge several aspects of the proceedings below.  Finding no reversible error, we affirm.

## I.

We begin with a brief overview of the case, saving a detailed recitation of the facts for the applicable analytical section below.  We present the facts in an objective manner.  See United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015).

The government charged Rose, Frye, and fourteen others with conspiring to distribute, and to possess with intent to distribute, cocaine and heroin.  See 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B).  The conspiracy was alleged to have lasted from approximately March 2008 until November 2010, and Rose and Frye were purportedly leaders in it.

The government's investigation into Rose and Frye picked up steam in mid-2010, and the two were ultimately arrested, indicted, and tried.  At trial, the government relied on the testimony of the case agent (Agent Timothy Quinn), recordings of wiretapped phone calls between the co-conspirators, and testimony from co-conspirators Delrico Graham and Stefan Pina.  The prosecution also introduced physical evidence, including contraband discovered at Rose's residence.

A jury ultimately convicted both Rose and Frye on the drug-conspiracy charge, and the judge sentenced each of them to twenty-five years in prison. This timely appeal followed.

**II.**

After carefully considering each of the defendants' contentions and extensively reviewing the record, we find four arguments to be worthy of discussion; the remainder lack arguable merit. We therefore limit our focus to: (1) the defendants' complaints respecting the government's wiretapping of their phones; (2) Rose and Frye's arguments concerning Agent Quinn's testimony; (3) Rose's challenge to the search of his home; and (4) both defendants' sentencing challenges grounded on Alleyne v. United States, 133 S. Ct. 2151 (2013).

**A. Wiretaps**

At trial, the government relied heavily on the tapes of intercepted phone calls between the co-conspirators. Both defendants argue that the phone wiretaps that produced the tapes were unnecessary and were therefore improperly authorized.

**1. Background**

Nearly two years into the government's investigation, agents requested permission to intercept calls to or from the telephones of Frye and Michael Andrews (another co-conspirator). To support that request, Agent Quinn submitted an 89-page affidavit that detailed the alleged criminal activities of Frye and Andrews,

the sources of information that led to that background knowledge, and details of the investigation itself. The affidavit specifically enumerated the prior, unsuccessful use of various other investigative methods, including: physical surveillance; review of prison tapes; use of confidential informants; use of pen registers, trap and trace devices, and toll records; execution of search warrants; use of grand jury subpoenas; interviews; intelligence from undercover agents; and examinations of discarded trash. Agent Quinn also explained why the government believed that there was probable cause for intercepting the calls.

Agent Quinn eventually filed six additional, analogous requests targeting phones belonging to Frye, Graham, and Rose. Although each affidavit was extensive in its own right, each also incorporated the facts from the previously submitted requests. As in the initial application, Agent Quinn meticulously described the prior investigative techniques and then explained why the phone intercepts were necessary. Based on these descriptions, the warrant judge (Saris, C.J., D. Mass.), authorized each wiretap.

Prior to trial, the defendants moved to suppress the wiretaps, see 18 U.S.C. § 2518(1)(c), and the court denied the motion. At trial, recordings of several of the calls were played, with a significant number capturing these defendants (along with other co-conspirators) discussing, albeit in code, their plans to purchase or sell drugs.

2.    **Discussion**

Our inquiry is guided by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522, which governs the rules for federal telephone wiretaps.  The law requires an officer to obtain judicial preclearance before instituting a wiretap by filing "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  Id. at § 2518(1)(c).  This aptly-named "necessity" prong requires the government to have "made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls."  United States v. Cartagena, 593 F.3d 104, 109 (1st Cir. 2010) (internal quotation marks and citation omitted).

When a defendant challenges on appeal a court's "necessity" determination, we ask whether "the facts set forth in the application were minimally adequate to support the determination that was made."  United States v. Yeje-Cabrera, 430 F.3d 1, 7 (1st Cir. 2005) (internal quotation marks and citation omitted).  Likewise, when a defendant asserts that the requesting officer omitted critical information from the affidavit that would have otherwise altered the court's necessity analysis, we only consider "whether, had the omitted information been included,

- 6 -

there would still have been a 'minimally adequate' basis for determining that the wiretap was necessary." Burgos-Montes, 786 F.3d at 103.

Rose and Frye begin with a broad attack on Agent Quinn's affidavit. They argue that Quinn withheld critical information from the judge when applying for the wiretaps, namely, that the government had placed a GPS tracking device on Frye's car.

Although Agent Quinn theorized about the possible, future use of a GPS-tracking device, he was far from Goldfinch-ian in the level of detail he provided about his actual, past reliance on it. Nonetheless, he did adequately explain why the telephone intercepts would have still been necessary even if the officers were to utilize a tracker in the future. That explanation clarified why a GPS-tracking device was inferior to a telephone intercept and why the GPS-device was insufficient for this investigation. For instance, Quinn wrote that "there is a significant risk that any GPS device[] would be discovered," and that such devices "provide no information about who (if anyone) [an individual] is meeting with, why he [or she] traveled to a particular location, and what happened once he [or she] was there." More specifically, Agent Quinn, aware from a wiretapped call that an individual had previously informed Frye to check his car for a "tracker," noted that "Frye (or at least one of his associates) is well aware of this law enforcement technique."

Agent Quinn's reasoning equally explains why the wiretaps were necessary, even given the government's actual use of the GPS device. Indeed, if Agent Quinn had written his statements in the past tense, rather than as a hypothetical, the judge's necessity inquiry would have remained exactly the same. If anything, the failure to put more information about the GPS tracker actually undersold the probable cause that existed to support the application. We ultimately "find no reason to conclude that the inclusion of [more information respecting past use of the GPS tracker] would have prevented the judge from deciding that a wiretap should [have been] issued." Cartagena, 593 F.3d at 111.

After that broad pitch, Rose specifically narrows in on wiretap applications #4 (Graham's phone) and #7 (Rose's phone). He notes that Agent Quinn's proffered justification for tapping phone #4 was to discover the "source of supply" of the drug conspiracy. Tapping phone #7, meanwhile, was allegedly necessary in order to learn more information about another co-conspirator, "Papa Doc." But, Rose says, these justifications were overly broad, and the applications sought information that the government already possessed.

The central flaw in Rose's argument is that he incorrectly assumes that any "partial success of the investigation" eliminates the need for further evidence. United

States v. Cao, 471 F.3d 1, 3 (1st Cir. 2006).[1]  As Agent Quinn persuasively demonstrated, however -- and in sufficient detail, despite Rose's protestations otherwise -- the government was still seeking a wealth of information at the time that it submitted the wiretap applications.  Further, Agent Quinn adequately described why any other investigative technique would not yield the evidence obtainable by a wiretap.

For example, Quinn noted that "although agents have observed Graham in the presence of Rose and Frye on multiple occasions, I know very little about the nature of his relationship with them."  As for "Papa Doc," Agent Quinn wrote that "my information about Papa Doc is quite limited, as I do not know his true identity," and that he was unaware of the amount of product that came from "Papa Doc."  He also indicated that the wiretaps could provide information as to how the conspirators obtained the drugs, the role that each individual played in the conspiracy, and the "means, and methods of the operation of the conspiracy."  As Agent Quinn wrote,

> I believe that Graham, who has served as Rose's narcotics courier and has been intercepted discussing distribution quantities of cocaine with Frye . . . [will assist] investigators [to] obtain a more

---

[1]  Indeed, such a rule would make little sense.  An affiant seeking a wiretap is required to establish probable cause.  In order to do so, one would expect for other investigative techniques to have been somewhat successful at the time of the wiretap application.

- 9 -

> detailed understanding of Graham's role [and]
> to identify more fully the members of the
> conspiracy, its methods and manners of
> operations, sources of supply, associates,
> customers, and illicit profits.

These detailed representations to the court were minimally adequate to support the warrant-judge's decision.[2]

Ultimately, given Agent Quinn's extensive declarations, combined with the deferential standard of review applicable to this wiretap challenge, we are satisfied that no error occurred.

B.   **Overview Testimony**

Frye and Rose next contend that the government improperly utilized Agent Quinn as an "overview witness," that is, he allegedly provided a broad summary of the government's entire case and discussed evidence not then in the record.

---

[2]  Frye advances two other arguments that fall within the penumbra of this challenge. First, he challenges the use of the GPS tracking device itself under the Supreme Court's decision in United States v. Jones, 132 S. Ct. 945, 949 (2012) (finding that such an investigative technique constitutes a search for Fourth Amendment purposes). As in United States v. Sparks, however, the good-faith exception to the exclusionary rule would apply to this pre-Jones use of a GPS tracker. 711 F.3d 58, 62 (1st Cir. 2013) (concluding that before Jones, it was reasonable for an officer to believe that the Fourth Amendment did not apply to investigations of vehicles on public ways). Second, Frye asserts that a Franks hearing was required to investigate Agent Quinn's decision to omit information about the past use of the GPS tracker in his wiretap application. Given the dearth of evidence reflecting an intentional or reckless omission, no clear error existed in the denial of that request. See United States v. Hicks, 575 F.3d 130, 138 (1st Cir. 2009).

- 10 -

1. **Background**

The government's central witness was Agent Quinn. The government called him on the third day of trial, and his testimony described activities covering the entire length of the conspiracy. Most notably, he spent a significant period of time testifying about the taped phone calls between the co-conspirators.

To lay a proper foundation, Agent Quinn first explained how the phone wiretaps operated logistically. He then clarified the role that he played in reviewing the calls and testified that he heard nearly 90% of the calls in real time. From this experience, Agent Quinn said that he became familiar with the voices of the key players in the conspiracy, along with the terms that they used. He also noted that he was conversant in the drug-distribution "lingo" from prior investigations.

His testimony developed a consistent rhythm. After the prosecutor played a tape recording of an intercepted call between co-conspirators, Agent Quinn would answer questions respecting what he heard. As calls were played, Agent Quinn noted whom he believed was talking and then described his understanding of the discussion's context. In doing so, he defined his understanding of terms such as "the shop," "a ball," "half a rope," "brown," and "tuck or swallow" -- all common nomenclature in this and other drug conspiracies.

The defendants fastidiously preserved their objections to this testimony and moved for a mistrial. The district court overruled their objections and denied the motion.

2. **Discussion**

We review the district court's rulings for abuse of discretion. United States v. Vázquez-Rivera, 665 F.3d 351, 357 (1st Cir. 2011) (evidentiary rulings); United States v. Freeman, 208 F.3d 332, 339 (1st Cir. 2000) (denial of a motion for a mistrial).

Both Rose and Frye argue that Agent Quinn's testimony essentially "link[ed] together the testimony provided by law enforcement and other non-cooperating witnesses and two cooperating witnesses." In the defendants' view, Agent Quinn "placed an imprimatur of veracity" on the other witnesses' statements. Compounding all of this, they say, was that his testimony "was presented early during trial to describe the government's theory of the case."

We have consistently admonished against the use of an "overview witness" by the government. Such a witness is typically "a government agent who testifies as one of the prosecution's first witnesses and, as the term implies, provides an overview or roadmap of the prosecution's case to come." United States v. Etienne, 772 F.3d 907, 913 (1st Cir. 2014); see, e.g., United States v. Meises, 645 F.3d 5, 13-18 (1st Cir. 2011) United States v. Flores-de-

Jesús, 569 F.3d 8, 20-26 (1st Cir. 2009); United States v. Casas, 356 F.3d 104, 117-21 (1st Cir. 2004). An overview witness is generally problematic as he or she may influence the jury's determination of facts or credibility assessments not yet in evidence; he or she may also provide testimony differing from what is to come; and the jury may place greater weight on the witness's testimony since it "has the imprimatur of the government." Etienne, 772 F.3d at 913 (internal citation omitted).

Overview testimony customarily contains "conclusory statements that are not based on the witness' personal knowledge, and which are unreliable because they often consist of inadmissible hearsay evidence," rather than testimony that is "squarely based on [a witness'] personal knowledge." United States v. Díaz-Arias, 717 F.3d 1, 13 (1st Cir. 2013). Where an officer testifies exclusively about his or her role in an investigation and speaks only to information about which he or she has first-hand knowledge, the testimony is generally (barring a different evidentiary issue) permissible. See id. (noting that such testimony is admissible since it is not the type of broad, overarching discussion about "the results of a criminal investigation, usually including aspects" the agent did not participate in) (internal citation omitted); see also United States v. Rosado-Pérez, 605 F.3d 48, 55 (1st Cir. 2010).

We do not find Agent Quinn's testimony (which, it should be noted, occurred on the third of seven days of trial, and thus was not the first testimony that the jury heard) to be overview testimony, let alone improper overview testimony. Agent Quinn testified exclusively from his personal knowledge, and he based his statements on his familiarity with the investigation and his exposure to the voices on the calls. Indeed, he first testified that he had heard 90% of the calls as they came in and, as a result, became intimately familiar with the voices and terms that were used. While his testimony may have canvassed the entire breadth of the conspiracy, he limited his discussion to his specific role in the investigation and his first-hand understanding of the events. That Agent Quinn was actually involved throughout the entire investigation, and thus was able to provide such detail about it, is simply not a reason to re-characterize his statements as inappropriate overview testimony. See United States v. Laureano-Pérez, -- F.3d --, 2015 WL 4577763 at *15 (1st Cir. July 30, 2015) ("Appropriate testimony does not become improper overview testimony just because one law enforcement official was present throughout the entire investigation and is then called to walk the jury through the investigation from beginning to end."). Nor, we note, did he vouch for other witness' credibility, discuss evidence not yet in the record, or provide testimony that would otherwise raise red flags

- 14 -

in this context.  See, e.g, Etienne, 772 F.3d at 913; Meises, 645 F.3d at 15.

Finding nothing to give us concern, we need go no further to reject this challenge.[3]

## C.   Search of Rose's Home

We next turn to Rose's argument that officers impermissibly searched the curtilage of his home, and that the government then obtained a warrant for that property based solely on the search.

### 1.   Background

On November 16, 2010, Rose and Frye were overheard on a wiretapped call discussing a plan to purchase two kilograms of cocaine from "Papa Doc."  Rose and Frye then met at a pharmacy where Frye gave Rose $28,000 for the deal.  Rose subsequently drove home and arranged for Omay Ford (another co-conspirator) to pick up the drugs.  Later in the day, Ford drove to a gas station near Rose's residence and waited for roughly twenty-five minutes until

---

[3]    The parties, particularly Rose, also appear to make a slightly distinct though overlapping argument.  They suggest that Agent Quinn's testimony violated Federal Rules of Evidence 701 and 702 because he both lacked personal knowledge and because his testimony did not aid the jury.  As noted, however, Agent Quinn testified exclusively from his personal knowledge.  Moreover, his testimony plainly assisted the jury in that it helped to place a significant number of calls into context.  The district court did not abuse its discretion in admitting this evidence.  See Díaz-Arias, 717 F.3d at 11-15.

an Acura SUV parked next to him.  Ford approached the SUV, leaned in, and appeared to retrieve something.

Government agents were surveilling Ford and followed him to Rose's home.  After Ford entered the residence, agents, led by Detective Brian Cohoon, took up a perimeter around the house.  Detective Cohoon crouched near the front door and peered through its glass.  After observing for a period of time, Detective Cohoon saw Rose carrying a stack of cash.  Cohoon thus approached the door, knocked, and announced, "Police, can you open the door?"  Rose responded by screaming, closing the blinds, grabbing several items, and running upstairs with Ford.  Believing that Rose and Ford were about to destroy contraband, the officers entered the home.  They then arrested Rose and Ford before securing the scene.

The following day, Agent Quinn obtained and executed a search warrant for the home.  That search yielded roughly two kilograms of cocaine, 440 grams of marijuana, and more than $75,000 in cash.

Rose moved to suppress the fruits of the search.  Although the district court perfunctorily stated that the officers entered the property in "bad faith," it nonetheless denied the motion.  It held that the agents' entry on November 16 was justified by exigent circumstances, and that the warrant obtained on the 17th was saved by the independent source doctrine.

## 2.    <u>Discussion</u>

We review legal questions underpinning the denial of the motion to suppress de novo and any factual findings for clear error.  <u>United States</u> v. <u>Silva</u>, 554 F.3d 13, 18 (1st Cir. 2009).

Rose highlights two alleged errors in the district court's decision.  First, he focuses on the night of November 16 and argues that the officer's presence on the curtilage of the property constituted an impermissible search.  He then contends that the district court failed to consider the effect of this illegal activity on the alleged exigent circumstances that followed.  Second, Rose argues that this impermissible search was the primary impetus for the search warrant the following day and, accordingly, tainted any physical evidence obtained from that search.

As we explain, we are not able to definitively resolve the legal merits of Rose's argument.  Even assuming that Rose is correct in his assertion of error, however, any error was ultimately harmless.  To reach that end point, we briefly examine the two relevant exceptions to the exclusionary rule: the exigent circumstances and independent source doctrines.  We begin with the former.

The exclusionary rule is inapplicable where "'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable

under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 394 (1978) (quoting McDonald v. United States, 335 U.S. 451, 456 (1948)). A recent case in which the Supreme Court applied this doctrine was Kentucky v. King, 131 S. Ct. 1849 (2011). There, officers approached a residence with the intent to knock on a door and chat with the inhabitants. Id. at 1854. However, the officers believed that they heard the defendants destroying evidence, and thus entered the property. Id. The Court held that the exigent circumstances doctrine applied since, inter alia, in approaching the door and knocking, the officers did nothing more than any ordinary citizen had a right to do. Id. at 1862.

Here, the district court relied on King when applying the exigent circumstances doctrine. But the district court appears not to have addressed the threshold issue of whether the officers "violat[ed] the Fourth Amendment," id. at 1858, by conducting a search around the curtilage of Rose's home and, if so, whether that violation sparked the exigent circumstances. The outcome of that threshold inquiry depends on "whether the officer's conduct was . . . objectively reasonable," that is, "whether the officers had an implied license to enter" the curtilage and then station themselves around the house. Florida v. Jardines, 133 S. Ct. 1409, 1417 (2012). If not, and if "their behavior objectively reveal[ed] a purpose to conduct a search, which is not what anyone would think

he [or she] had license to do," id. at 1417, then their presence on the property was impermissible.

This record leaves us unable to determine precisely what the officers were doing when they entered the property on the evening of November 16. The district court briefly noted that the officers entered the property in "bad faith"; a conclusory statement without any predicate factual findings, and one that is not dispositive as to whether the officers' presence violated the Constitution. See King, 131 S. Ct. at 1859. Other than that single statement, the district court did not find any additional facts that shed light on the length of time that the officers surveilled before knocking on the door, or that described the officers' intent, or that otherwise established the officers' precise movements. Simply stated, we do not know whether the officers observed Rose's incriminating actions because they were waiting to approach the suspects until they had proof of contraband, or whether the officers were just positioning themselves around the property in anticipation of a knock and talk. See Jardines, 133 S. Ct. at 1415 ("[The Fourth Amendment] would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window"); see also King, 131 S. Ct. at 1858

("The exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense."); cf. Horton v. California, 496 U.S. 128, 136-40 (1990).

Given that absence of factual findings on the issue of lawful presence, we proceed under the assumption that the officers' entry on November 16 was improper. As such, we next ask whether the search warrant obtained the following day was thereby tainted. As the district court noted, that claim hinges on whether the warrant was obtained independently of any impermissible police conduct and thus saved by the independent source doctrine. To evaluate an independent source claim, we ask whether "the agents' decision to seek the warrant was prompted by what they had seen during the initial [illegal] entry." United States v. Dessesaure, 429 F.3d 359, 369 (1st Cir. 2005) (quoting Murray v. United States, 487 U.S. 533, 542 (1988). That subjective inquiry thus turns on whether the particular officer would have still sought the warrant absent the unlawfully-obtained information. "In making [that] factual determination . . . the district court is not bound by after-the-fact assurances of [the officer's] intent, but instead must assess the totality of the attendant circumstances to

ascertain whether those assurances appear implausible."  Id.
internal quotation marks omitted).[4]

In this case, the district court concluded that the independent source doctrine applied.  It noted that "the evidence Agent Quinn marshaled in support of the search warrant application came from sources wholly unconnected with the entry and was known to the agents well before the initial entry."  While that observation is true enough, it reveals little about Agent Quinn's subjective intent.  That is, there was no finding that Agent Quinn would have sought the warrant irrespective of the November 16 search.

As we see it, the record (specifically Agent Quinn's declarations in the wiretap applications that he would seek a warrant for Rose's residence as soon as drugs were connected to his house) "provide[s] [some] support for the Government's position.  Murray, 487 U.S. at 543.  But, as the Supreme Court reminded in Murray, "it is the function of the District Court rather than the Court of Appeals to determine the facts."  Id.
This is true even where a court of appeals could theoretically

---

[4]  In addition to the subjective prong of the analysis, we examine whether "information obtained during the entry was presented to the Magistrate and affected his [or her] decision to issue the warrant."  Id. at 365 (quoting Murray, 487 U.S. at 542).
This aspect of the analysis is "wholly objective."  Id.  On this factor, our review of the warrant application leaves little doubt that the independent information was sufficient to support the judge's decision to issue the warrant.

cobble together varying aspects of the record to infer the officer's subjective intent. See id. (concluding that while the district court found that one could "perhaps infer from [the facts] that the agents who made the entry already planned to obtain the 'critical evidence through a warrant-authorized search' it was not strong enough for the court of appeals to find the fact on its own); see also United States v. Wright, 493 F.App'x 265, 271-72 (3d Cir. 2012); cf. United States v. Cordero-Rosario, 786 F.3d 64, 78 (1st Cir. 2015). Thus, even if we were inclined to say that the district court would likely have found an intent to seek the warrant given the court's ultimate adoption of the independent source doctrine, the absence of such a finding hinders our ability to conclusively rule on this challenge.

As noted, however, remand is not necessarily required even were we to credit the defendant's arguments. Instead, we must ask whether the "government can prove beyond a reasonable doubt that the [putative] error complained of did not contribute to the verdict obtained." United States v. Green, 698 F.3d 48, 53-54 (1st Cir. 2012) (internal quotation marks and citation omitted).

In this case, the government referred to the potentially-tainted physical evidence in its opening and closing arguments. But, such evidence played a minimal role in the larger context of the government's case. We are therefore confident that

the remaining evidence was so overwhelming that, even if this evidence should have been excluded, its inclusion did not affect the verdicts.  A brief summary shows why.

The government presented compelling evidence reflecting the length and breadth of the conspiracy, along with the specific role that each defendant played.  That evidence begins with the detailed testimony of two eyewitnesses, co-conspirators Pina and Graham.

Graham testified that he agreed to, and did, distribute both cocaine and heroin with Rose and Frye.  Indeed, Graham discussed a number of occasions on which he delivered drugs directly to both defendants, and to occasions when he saw both individuals with large quantities of cocaine.  He indicated that he had known Frye for twelve years, transported cocaine on his behalf, and was often paid in cocaine for his services.  He also discussed a specific instance in which he had transported cocaine from Rhode Island to a condominium where Frye and Rose were waiting for the delivery.  Finally, he identified Ford as Rose's supplier.

For his part, Pina testified in significant detail about times in which he had obtained drugs for Frye.  He further testified that he received an "eight-ball" of heroin from Rose and Frye.  Significantly, he discussed an instance when Rose and Frye came to his house and obtained a kilo of cocaine, then pressed it, blended it, cut it up, and bagged it for sale.

Crucially, the government's case did not rest on the admittedly sufficient, but arguably always open to challenge, testimony of cooperating witnesses. Rather, that testimony was corroborated and repeatedly reinforced by the vivid portrait of defendants painted in their recorded conversations and surveilled actions, as well as the physical contraband unconnected with the challenged search or its arguable fruits. This evidence easily established four central events that formed the heart of the government's case.

First, the government introduced evidence that on the evening of September 19, 2010, Rose was in contact with his seller, Omay Ford. Rose then sent Graham to pick up a kilogram of cocaine from Ford. Graham subsequently did so and then delivered the drugs to Rose. Rose, however, was displeased with the product. He thus ordered Graham to return the bag because the product was "no good." He also paid Graham for these services in cocaine that was, in contrast to the cocaine obtained from Ford, described as "banging."

Second, the government established that on September 21, 2010, Frye and Pina attempted to mail a package of heroine to Anthony Vaughn. Frye and Pina went to a pharmacy and purchased an item in which to hide the drugs. Frye then arranged for an associate to mail the package, but a postal inspector recovered the package mid-transport. The inspector found nearly 10 grams of heroin inside of the package.

The government also highlighted an event from later that same month in which Frye and Pina were awaiting a delivery of cocaine. Law enforcement had been surveilling the van making the delivery. A state trooper pulled the van over for a driving violation, searched the vehicle, and discovered nearly 200 grams of heroin. The co-conspirators were later overheard during wiretapped conversations discussing this event.[5]

The final, central event, previously discussed, occurred just before the putatively illegal search on November 16. The government established that before the officers even entered Rose's property, Rose and Frye had agreed to purchase two kilograms of cocaine for $28,000. The two then took multiple overt steps -- most notably, transferring money from one individual to the other -- to accomplish that goal.

On the whole, we are satisfied beyond a reasonable doubt that a jury would have convicted these two defendants even if the evidence recovered from the search of Rose's home was improperly admitted. The challenged evidence was cumulative; there was already sufficient testimony and physical evidence respecting both

---

[5] Even defendant's use of code words of the "trade" (itself an inculpatory behavior) did not conceal the probative force of their conversations. Thus, for example, in describing the truck that was pulled over and what was found in the truck, Adalberto Graciani said to Frye, "Ah, estimate about 40, 40,000 I think in heroin, and -- I mean, $40,000 worth in the streets and she he -- they was sayin."

the conspiracy itself and the vast quantity of drugs flowing through it.  Nor, given all of this other evidence, do we think that the brief mention of the physical contraband during arguments at trial affected the result.[6]  Thus, questions about the legality of the officers' conduct in entering Rose's home on November 16, 2010, are not sufficient to disrupt the convictions.

## D.    **Alleyne**

This brings us to the defendants' sentences.  Rose and Frye argue that the district court, rather than the jury, made certain drug-quantity findings, and that the court then imposed a

---

[6]    Early in its opening statement to the jury, the government did appear to emphasize the physical evidence.  But, the prosecutor's reference to the items seized on November 16 quickly transitioned into a discussion of the events and evidence that led to the government's search that day.  Indeed, of the nearly thirty minute opening statement, the government spent roughly five minutes discussing the events of the 16th.  Only about one minute of that time discussed the physical contraband.

The closing argument even more plainly manifests the minimal role that the physical contraband played in the case.  The government began its closing argument by reminding the jury of the evidence that it had heard.  The prosecutor specifically referenced the taped phone calls and the live testimony, while only obliquely referring to "all of the exhibits."  Following this, the government discussed the events of November 16 and emphasized that Rose and Frye's actions on that day were sufficient by themselves for the jury to find the two guilty.  In making that argument, the government again focused on the phone calls and the events leading up to the search; not the physical evidence.  In total, the government spent roughly one third of its thirty-three minute closing argument on the events of November 16.  Of that time, it devoted about one minute to the physical contraband.  Although the government thereafter referred to the physical evidence (including contraband independent of the events of November 16), it simply did so sporadically and as icing on an already-baked cake.

statutory mandated sentence based on those findings, in violation of Alleyne v. United States, 133 S. Ct. 2151 (2013).

## 1. Background

At sentencing, the district court determined by a preponderance of the evidence that Rose was responsible for at least 9 grams of cocaine, 20 grams of heroin, and 1.77 kilograms of marijuana. Those quantities subjected Rose to a mandatory minimum sentence of 20 years, 21 U.S.C. §§ 841(b)(1)(A)&(B) & 846, although neither the court nor the parties mentioned that mandatory minimum at sentencing. In contrast to the 240-month statutory minimum, calculations pursuant to the sentencing guidelines resulted in a recommended 360-month to life incarcerative sentence. The district court, finding that the guidelines range was inflated, imposed a below-guidelines sentence of 300 months.

Likewise, the court concluded that Frye was responsible for 14 kilograms of cocaine and 923.05 grams of heroin, which also subjected him to a 20-year mandatory minimum. At Frye's sentencing hearing, the district court noted in passing that this mandatory minimum applied. Like Rose, Frye's guidelines range was 360 months to life. The court, relying on the factors enumerated in 18 U.S.C. § 3553(a), varied below the guidelines range and also sentenced Frye to 300 months in prison.

## 2. **Discussion**

Typically, we review de novo whether a sentence was improper under Alleyne. See Etienne, 772 F.3d at 922. But unpreserved claims of Alleyne error, such as those here, are reviewed for plain error. United States v. Harakaly, 734 F.3d 88, 94 (1st Cir. 2013); see United States v. Ramos-González, 775 F.3d 483, 499 (1st Cir. 2015) (plain error requires a showing of an error that "was clear or obvious, and that it both affected [the defendant's] substantial rights and seriously impaired the fairness, integrity, or public reputation of judicial proceedings.").[7]

The government states that "[t]he district court violated Alleyne by concluding that Rose [and Frye were] subject to a mandatory minimum based on judge-found drug quantities." Despite that apparent concession, we question whether any Alleyne error actually occurred. See Etienne, 772 F.3d at 922 ("Although the parties agree an Alleyne error occurred, their stipulation on this question of law is of no import."). In United States v.

---

[7]    Rose concedes that he did not preserve his Alleyne claim and thus plain error review applies. Frye, by contrast, goes to some length to show that he preserved the issue. Yet, in the district court below, he objected only to "the quantities set forth in the PSR and request[ed] an evidentiary hearing on the issue of quantity." He did not argue that the jury, rather than the court, was required to make the drug quantity determination beyond a reasonable doubt. Accordingly, Frye has not preserved the precise claim that he now asserts. See United States v. Samboy, 433 F.3d 154, 161 (1st Cir. 2005).

Ramírez-Negrón, we noted that "failing to prove an individualized drug quantity is an Alleyne error only in cases in which the defendant has been convicted and sentenced under the aggravated version of the statute -- that is, where an enhanced mandatory minimum applies." 751 F.3d 42, 49 (1st Cir. 2014) (emphasis added) (internal quotation marks and citation omitted). With respect to one of the defendants in that case, we concluded that "[t]he record provides no evidence that the district court made any findings to trigger a . . . mandatory minimum; rather, it shows that the court imposed a Guidelines sentence." Id. at 50. We found it relevant that "neither the judge nor either party at sentencing even mentioned that a mandatory minimum was under consideration . . . . Instead, the sentence was based only on Guidelines consideration." Id.

The record here -- other than a brief reference to the mandatory minimum in Frye's case -- is quite similar. For both defendants, the court exclusively based its sentence on the guidelines, and thus seemed to avoid sentencing the defendants under the aggravated statutory provisions. Indeed, when discussing the drug-quantity findings, the court framed the question as one that solely affected the guidelines inquiry. The court stated that it would "use that [its findings] as [to] the number of kilos to establish the base offense level." Utilizing that base offense level, and the factors referenced in 18 U.S.C.

§ 3553(a), the court then imposed sentences based purely on guidelines considerations. While the court's single reference to the mandatory minimum perhaps makes Frye's case a bit closer, we are nonetheless inclined to say that Alleyne was not implicated here. See United States v. Lanza-Vázquez, ___ F.3d ___, 2015 WL 5042806, at *14 (1st Cir. Aug. 27, 2015) ("Although the district court in this case made a passing reference that the amount of drugs 'is the minimum pursuant to the statutory minimum,' its actual sentencing decision was based purely on Guidelines considerations and the factors enumerated in 18 U.S.C. § 3553(a).").

Either way, neither party can establish the necessary prejudice to sustain their claim. Following Alleyne, we have repeatedly emphasized that no prejudice exists when "it can fairly be said . . . that the assigned error did not contribute to the result of which appellant complains," and "[i]n drug cases, overwhelming evidence of the requisite drug types and quantities generally serves as a proxy for determining whether the Alleyne error contributed to the result." United States v. Morris, 784 F.3d 870, 874 (1st Cir. 2015) (internal quotation marks and citations omitted); see also Ramírez-Negrón, 751 F.3d at 51 n.8.

In this case, the government established that both defendants were individually responsible for conspiring to distribute more than five kilograms of controlled substances (even

excluding the drugs found at Rose's residence).  Some of the evidence to establish drug quantity presented at trial included: Rose and Frye's agreement to purchase two kilograms of cocaine on November 16 (irrespective of the legality of the seizure of those drugs); Graham's testimony that he transported a kilogram of cocaine for Frye "every three weeks, two a month, every month" for a year; Pina and Graham's testimony that they observed both Rose and Frye "pressing, cutting, and bagging" kilograms of cocaine for distribution; Graham's testimony that he was paid in cocaine by Rose and picked up approximately one kilogram of cocaine from Rose "plenty" of times; Graham's testimony that Rose ordered him to return a kilogram of cocaine because it was "no good"; Graham's testimony that he met Ford on four to five occasions at Rose's residence to transport cocaine; testimony relating to 200 grams of heroin that Frye was expecting for delivery; and testimony from another co-conspirator, Bonnie Bearse, that Rose stashed significant quantities of cocaine at her house.  Given this overwhelming evidence, the defendants cannot establish plain error justifying relief.[8]

---

[8]  Frye also argues that the district court impermissibly utilized a prior offense (conspiring to provide contraband to a federal inmate, 18 U.S.C. § 371) to move him into the grasp of the guidelines' career offender provision.  Although the statute pertaining to his prior conviction was divisible, he argues that the district court failed to engage in the appropriate analysis to determine whether the prior offense was actually a drug crime. See Descamps v. United States, 133 S. Ct. 2276, 2283 (2013);

**III.**

Finding no reason to disturb the convictions or sentences, we **affirm**.

---

Shepard v. United States, 544 U.S. 13, 19 (2005).  We need not determine if an error occurred, since any mistake was harmless. First, the career offender classification had no impact on Frye's base offense level.  Second, while the offense did move Frye's criminal history from category V to category VI, that designation ultimately had no impact on the guidelines recommendation, which ultimately drove the district court's sentencing decision. Indeed, given the severity of the offense, the guidelines still recommended 360 months to life, irrespective of Frye's criminal history.  U.S.S.G. ch. 5, pt. 8.