# United States Court of Appeals
## For the First Circuit

No. 14-1712

UNITED STATES OF AMERICA,

Appellee,

v.

DILEAN REYES-RIVERA,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, Chief U.S. District Judge]


Before

Lynch, Stahl, and Barron,
Circuit Judges.


Michael R. Hasse, for appellant.
Nelson Pérez-Sosa, Assistant United States Attorney, Chief,
Appellate Division, with whom Rosa Emilia Rodríguez-Vélez, United
States Attorney, was on brief, for appellee.


January 29, 2016

**LYNCH**, **Circuit Judge**.  Dilean Reyes-Rivera was the mastermind of a Ponzi scheme, operated largely in Puerto Rico, which defrauded over 230 vulnerable people out of approximately $22 million.  In 2012, he pled guilty to bank fraud and to conspiracy to commit wire fraud, and in 2013 he was sentenced to concurrent terms of 60 months of imprisonment on the wire fraud conspiracy count and 242 months on the bank fraud count.  He appeals, bringing a number of challenges to his 242-month sentence, basically saying the sentence is too high because his was only a "run-of-the-mill" Ponzi scheme.  Finding no error, we affirm.

                                   I.

Because this sentencing appeal follows a guilty plea, we draw the relevant facts from the plea agreement, the change-of-plea colloquy, the presentence investigation report ("PSR"), and the transcript of the sentencing hearing.  United States v. King, 741 F.3d 305, 306 (1st Cir. 2014).

Reyes-Rivera was the president of Global Reach Trading ("GRT"), a for-profit corporation registered in Florida and Puerto Rico that operated as a front for an extensive Ponzi scheme.  As president, Reyes-Rivera had access to and signatory authority on all GRT bank accounts and business transactions.  Reyes-Rivera's younger brother, Jeffrey Reyes-Rivera ("Jeffrey"), a licensed attorney in Puerto Rico, was one of the incorporators of GRT as well as its accountant, and was a co-defendant.

Between 2001 and 2007, the Reyes-Rivera brothers, along with promoters and sales agents who worked for GRT, solicited money from unsuspecting individuals, mostly from Puerto Rico, by promising to invest the money in low-risk, short-term, high-yield investment programs. Investors were guaranteed a particular rate of return, ranging between five percent and twenty percent. Neither Reyes-Rivera, Jeffrey, nor GRT was registered or licensed to offer or sell investments to the general public by either the U.S. Securities and Exchange Commission or the Office of the Commissioner of Financial Institutions of Puerto Rico.

The money they secured from misled investors was not actually invested but instead funded a Ponzi scheme, in which they used the money they received from later investors to pay "returns" to earlier investors. The Reyes-Riveras took about $4.6 million from the proceeds of the scheme to purchase or lease for their own benefit luxury vehicles, houses, furniture, jewelry, and trips.

During the course of the scheme, the Reyes-Riveras also operated other entities, incorporated in Puerto Rico, Antigua and Barbuda, and Florida, in order to conduct businesses similar to GRT. In 2005, Reyes-Rivera, on behalf of one of these entities, WR4 Equity Corporation, secured a mortgage loan with First Bank, a federally insured financial institution, for approximately $1.7 million with the use of fraudulent documents, including personal financial statements and a GRT financial statement.

To conceal the scheme, the Reyes-Riveras placed the funds invested in GRT in eighteen different bank accounts, held in their personal names and in the names of their various entities, and with at least three different banks in multiple countries. They also did not refer to the investors' signed investment contracts as involving "securities." Instead, they used various misleading euphemisms like "Private Programs of Commercial Paper" and "Special Private Placement Programs." In addition, they imposed a strict code of confidentiality and non-disclosure on their investors.

Dilean Reyes-Rivera was the mastermind of the operation. He admitted after his arrest that he influenced Jeffrey to assist him in perpetrating the fraud and that Jeffrey followed his instructions. He also stated that he was the one who made all of the business decisions, that Jeffrey always consulted him before making a contract or bringing in a new investor, and that he never actually explained the business to Jeffrey.[1]

When all was said and done, Reyes-Rivera had defrauded more than 230 investors out of over $22 million. Many of these victims were retirees or pensioners. The PSR includes summaries of victim impact statements submitted by roughly fifty of Reyes-

---

[1] At oral argument, Reyes-Rivera's counsel stated that Jeffrey was fully aware of the nature of the scheme. But this representation is inconsistent with a contrary statement in the PSR, to which Dilean did not object.

Rivera's victims.  The victims described how much they invested and how many lost their life savings.  Many now suffer physical and emotional problems, such as anxiety, high blood pressure, insomnia, depression, and panic attacks.  One victim described becoming incapacitated and being hospitalized in a psychiatric facility and placed on psychotropic medications.  Another became suicidal.

## II.

On September 25, 2008, the Reyes-Riveras were indicted by a grand jury on counts of conspiracy to commit securities fraud, conspiracy to commit wire fraud, and conspiracy to commit money laundering, as well as a forfeiture allegation.  Reyes-Rivera alone was also indicted on an additional count of bank fraud based on the WR4 Equity Corporation mortgage loan.  Reyes-Rivera fled and remained a fugitive until he was arrested in Spain on September 6, 2009 and extradited to the United States on October 18, 2010.

On November 21, 2012, the Reyes-Riveras entered into a package plea deal.  Dilean Reyes-Rivera pled guilty to conspiracy to commit wire fraud, which carries a statutory maximum term of five years' imprisonment, 18 U.S.C. §§ 371, 1343, and bank fraud, which carries a statutory maximum term of thirty years' imprisonment, id. § 1344.  He also admitted the forfeiture allegation.  Id. § 982(a)(2)(A).

- 5 -

The plea agreement calculated Reyes-Rivera's guidelines sentencing range to be 121 to 151 months, based on the following: a base offense level of seven, U.S.S.G. § 2B1.1(a)(1), a criminal history category of I, a twenty-point enhancement because the amount of loss exceeded $7 million, id. § 2B1.1(b)(1)(K), a four-point enhancement because more than fifty victims were involved, id. § 2B1.1(b)(2)(B), a two-point enhancement because Reyes-Rivera derived more than $1 million in gross receipts from one or more financial institutions, id. § 2B1.1(b)(15)(A), a two-point enhancement for his leadership role in the scheme, id. § 3B1.1(c), and a three-point reduction for acceptance of responsibility, id. § 3E1.1.[2] The government, however, agreed to recommend a sentence of between 72 and 136 months of imprisonment. The plea agreement also stated that the government intended to seek full restitution in the amount of $22 million. On November 21, 2012, a magistrate judge recommended that the district court accept Reyes-Rivera's guilty plea.[3]

---

[2] Because Reyes-Rivera was sentenced on June 26, 2013, the November 2012 version of the sentencing guidelines applies. See U.S.S.G. § 1B1.11(a).

[3] The PSR was filed on May 22, 2013. It calculated Reyes-Rivera's guidelines sentencing range to be 235 to 293 months of imprisonment. This calculation differed from the calculation in the plea agreement because it imposed 1) a twenty-two-point enhancement for losses in excess of $20 million, U.S.S.G. § 2B1.1(b)(1)(L); 2) a two-point enhancement for use of sophisticated means, id. § 2B1.1(b)(10)(C); and 3) a four-point enhancement for Reyes-Rivera's leadership role, id. § 3B1.1(a).

Sentencing took place on June 26, 2013.[4]  Many of the victims appeared and the district court heard statements from those who wished to speak.  The district court calculated Reyes-Rivera's guidelines sentencing range to be 188 to 235 months, which is not independently challenged on appeal.  The district court used a base offense level of seven and a criminal history category of I.  The court then imposed a twenty-point enhancement for amount of loss, a two-point enhancement for Reyes-Rivera's leadership role, a four-point enhancement for the number of victims, a two-point enhancement for gross receipts in excess of $1 million, and a three-point reduction for acceptance of responsibility, as recommended by the plea agreement.  It additionally imposed a two-point enhancement for use of sophisticated means, as recommended

_____

The PSR also recommended restitution in the amount of $22 million, and noted that if the court were to consider a variance, it could factor in the severe harm caused to the victims of the scheme and the fact that Reyes-Rivera remained a fugitive before his arrest and extradition.  Reyes-Rivera filed objections to the enhancements for amount of loss, sophisticated means, and leadership role; the $22 million restitution recommendation; and the statement of factors that might support a variance.

[4]  Before sentencing, Reyes-Rivera filed a sentencing memorandum raising the issue of sentencing disparity, referencing three cases -- two from within the District of Puerto Rico and one from the Southern District of New York -- that he alleged were substantially similar to his case and resulted in sentences similar to the lower end of what was recommended in the plea agreement.  His sentencing memorandum also urged the district court to consider his efforts to assist the government in investigating the scheme and his "fruitful efforts to rehabilitate."

by the PSR.  The court also, sua sponte, imposed a two-point enhancement for abuse of a position of trust.  Id. § 3B1.3.

After calculating the guidelines range and explaining its consideration of the 18 U.S.C. § 3553(a) factors, the court sentenced Reyes-Rivera to concurrent terms of imprisonment of 60 months on the wire fraud conspiracy count and 242 months on the bank fraud count.  In choosing to impose a seven-month upward variance, the district court placed particular emphasis on the "pain and suffering" that Reyes-Rivera caused his victims, recounting in detail the physical, emotional, and financial harm inflicted upon them.  Restitution was also ordered in the amount of $10,629,021.01.  This appeal followed.

Jeffrey, who was not indicted on the bank fraud count and so only pled guilty to the wire fraud conspiracy count, was sentenced to 48 months of imprisonment by the same judge.[5]

III.

We review a district court's imposition of a sentence for abuse of discretion.  United States v. Clogston, 662 F.3d 588, 590 (1st Cir. 2011).  Our analysis is two-fold: "we first determine

---

[5]   The judgment entered on June 12, 2014 in Jeffrey Reyes-Rivera's case states that he was sentenced to 48 months of imprisonment.  However, Dilean Reyes-Rivera, in his brief before this court, represents that Jeffrey was sentenced to 58 months.  Citing Reyes-Rivera's brief, the government also places Jeffrey's sentence at 58 months.  In any event, whether Jeffrey was sentenced to 48 or 58 months does not impact our resolution of the case.

whether the sentence imposed is procedurally reasonable and then determine whether it is substantively reasonable."  Id.

We review the district court's interpretation of the guidelines de novo and its fact finding for clear error.  United States v. O'Connell, 252 F.3d 524, 528-29 (1st Cir. 2001).  When the defendant fails to raise a procedural objection at sentencing, however, we review only for plain error.  United States v. Millán-Isaac, 749 F.3d 57, 66 (1st Cir. 2014).  To show plain error, a defendant must establish: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).[6]

A.   Procedural Reasonableness

A sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence --

---

[6]   The parties are correct that the waiver of appeal provision in Reyes-Rivera's plea agreement does not bar the instant appeal because the sentencing judge did not sentence Reyes-Rivera in accordance with the plea agreement's recommended sentence.

including an explanation for any deviation from the Guidelines range." United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008) (quoting Gall v. United States, 552 U.S. 38, 51 (2007)). Reyes-Rivera launches several attacks on the procedural reasonableness of his sentence, only some of which are preserved, and all of which we reject.

### 1. Abuse of Position of Trust Enhancement

Reyes-Rivera argues that the district court erred in imposing an enhancement for abuse of a position of trust, saying he does not meet the qualifications. U.S.S.G. § 3B1.3 provides for a two-point enhancement "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." For the enhancement to apply, "the district court must first decide that the defendant occupied a position of trust and then find that he used that position to facilitate or conceal the offense." United States v. Gill, 99 F.3d 484, 489 (1st Cir. 1996).

Application note 1 to § 3B1.3 states that a position of public or private trust is one "characterized by professional or managerial discretion" and that "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 cmt. n.1; see United States v. Chanthaseng, 274 F.3d 586, 589 (1st Cir. 2001).

- 10 -

Application note 3 clarifies that the enhancement applies equally to those holding a "sham position of trust." United States v. Haber, 251 F.3d 881, 891 (10th Cir. 2001).

> This adjustment also applies in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not. For example, the adjustment applies in the case of a defendant who (A) perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker; or (B) perpetrates a fraud by representing falsely to a patient or employer that the defendant is a licensed physician. In making the misrepresentation, the defendant assumes a position of trust, relative to the victim, that provides the defendant with the same opportunity to commit a difficult-to-detect crime that the defendant would have had if the position were held legitimately.

U.S.S.G. § 3B1.3 cmt. n.3; see United States v. Ghertler, 605 F.3d 1256, 1265–66 (11th Cir. 2010) (explaining the history and purpose of application note 3).

Reyes-Rivera asserts that he did not possess any professional or managerial discretion because he was just an "investment lender, or salesman," which "did not in any way give him any special ability to commit a difficult-to-detect wrong." He argues that all fraud schemes require some level of trust between the fraudster and the victim, and so "the mere fact that the victim-investors in this case may have trusted . . . Reyes-Rivera is not sufficient to justify the application of this

increase." See United States v. Hirsch, 239 F.3d 221, 227 (2d Cir. 2001).

He understates his role, and the district court committed no error. Reyes-Rivera "in fact exercised considerable authority and discretion" at GRT. United States v. Sicher, 576 F.3d 64, 72 (1st Cir. 2009). He was not a simple salesman; he was the president of, what appeared to be, a legitimate investment company. He retained access to and signatory authority on all GRT bank accounts and business transactions.[7]

As to the question whether he "used [his] position to facilitate or conceal the offense," id. at 71 (quoting Gill, 99 F.3d at 489), it is close to self-evident that Reyes-Rivera was able to operate and conceal his scheme in large part because he held himself out as the president of a purportedly legitimate investment company. The district court found that Reyes-Rivera used his position to "seek[] persons to trust in his ability to do investments and to receive the monies to be placed under his trust . . . in promise of a high yield return." The court further characterized Reyes-Rivera as having "invite[d] [the victims] as president of a corporation that was doing this type of investment

---

[7] As for his actual authority, Reyes-Rivera conceded that Jeffrey followed all of his instructions, that Reyes-Rivera was the one who made all the business decisions, and that Jeffrey always consulted him before making a contract or bringing in a new investor. In fact, he admitted that he never even explained the business to Jeffrey.

when [he was] lying to them in terms of [his] abilities, [his] potential or the investments."

Reyes-Rivera had also previously held a valid license to sell securities for a prior employer. As the district court found, "his training in securities, the experience he had gained allowed him to step in, make all of these representations concerning this huge, magnificent investment he was offering out there." This fits neatly into application note 3.

Several of his victims stated that he in fact betrayed their trust. And Reyes-Rivera recognized at sentencing that "they trusted in me." See id. at 73 (While "testimony by individuals that they trusted someone who betrayed their trust does not itself establish that the position was a position of trust[, t]he testimony . . . is not irrelevant.").

The enhancement was correctly applied.

2. Sophisticated Means Enhancement

Reyes-Rivera argues that the district court erred in imposing a two-point enhancement for his use of "sophisticated means" in operating the scheme. U.S.S.G. § 2B1.1(b)(10)(C). Application note 8(B) provides: "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts . . . ordinarily indicates sophisticated means." Id. § 2B1.1 cmt. n.8(B). The district court found, in accordance with application note 8(B),

- 13 -

that Reyes-Rivera operated several different corporate entities with bank accounts at various institutions in several countries "in order to conceal the illegal nature and source of funds [the Reyes-Riveras] had received from GRT." Reyes-Rivera appears to have accepted this finding on appeal, conceding that "this enhancement was part of his stipulated conduct." Either way, there was no error in the district court's finding.

His argument on appeal instead urges this court to "apply a relative scale in making findings as to sophistication," claiming that relative to other Ponzi schemes, his was just "run-of-the-mill." He candidly admits that he has "no judicial, statutory, or regulatory support" for his theory. On this admission, we agree. There is no error.

3. Overlapping Enhancements

Reyes-Rivera makes two related arguments to the effect that the district court erred by imposing a series of enhancements that are "substantively overlapping." Both of these arguments are raised for the first time on appeal, and so the government argues they are waived.[8] See United States v. Torres-Landrúa, 783 F.3d

---

[8] Simply to say that Reyes-Rivera did not raise the issue in the trial court is insufficient to establish waiver. See United States v. Walker, 538 F.3d 21, 23 (1st Cir. 2008). The arguments may well be waived, though. Reyes-Rivera not only failed to object to the series of enhancements, but he also affirmatively agreed in his plea agreement to four of the six enhancements accounting for twenty-eight of the thirty-two enhancement points he received. See United States v. Rivera-Orta, 500 F. App'x 1, 3 (1st Cir. 2013)

58, 66 (1st Cir. 2015); United States v. Falu-Gonzalez, 205 F.3d 436, 440 (1st Cir. 2000).

The arguments, whether waived or not, still fail plain error review. Reyes-Rivera's first argument is that the district court engaged in impermissible "double counting." He is wrong. "[W]hen 'neither an explicit prohibition against double counting nor a compelling basis for implying such a prohibition exists, clearly indicated adjustments for seriousness of the offense and for offender conduct can both be imposed, notwithstanding that the adjustments derive in some measure from a common nucleus of operative facts.'" United States v. McCarty, 475 F.3d 39, 46 (1st Cir. 2007) (quoting United States v. Lilly, 13 F.3d 15, 20 (1st Cir. 1994)); see United States v. Fiume, 708 F.3d 59, 62 (1st Cir. 2013) ("Given the Commission's proclivity for indicating when double counting is forbidden, we are reluctant to infer further such instances out of thin air.").

Reyes-Rivera does not point to any explicit prohibition against applying these enhancements as double counting and offers

_____

("A defendant cannot agree to both an enhancement and its factual predicate, reiterate that agreement in open court, and later repudiate it merely to suit his later convenience."); United States v. Serrano-Beauvaix, 400 F.3d 50, 56 (1st Cir. 2005). "These actions ring not of 'oversight, inadvertence, or neglect in asserting a potential right,' but rather of a deliberate course of conduct." United States v. Gaffney-Kessell, 772 F.3d 97, 100 (1st Cir. 2014) (quoting United States v. Eisom, 585 F.3d 552, 556 (1st Cir. 2009)).

no compelling explanation for inferring a prohibition. Sentencing enhancements serve different purposes, see Lilly, 13 F.3d at 18–19, and we see no plain error in the court's determination that each of these enhancements applied.[9]

Reyes-Rivera's second argument is that the district court erred by not granting a "downward departure"[10] in light of the allegedly overlapping enhancements, citing United States v. Jackson, 346 F.3d 22, 26 (2d Cir. 2003). We will treat this issue under the topic of substantive reasonableness below.

4. Cooperation with the Government

Reyes-Rivera next argues that "the sentencing court should have considered and reduced [his] offense level or at least have imposed the agreed upon sentence because of [his] complete and candid cooperation [with the government], in accordance with

---

[9] At one point in his brief, Reyes-Rivera takes aim at the amount of loss enhancement. He argues that the district court miscalculated the amount of loss, pointing to a debate at sentencing about the proper restitution amount. He offers $8,154,700 as the appropriate figure. But the twenty-point enhancement he received under U.S.S.G. § 2B1.1(b)(1)(K) applies to an amount of loss in excess of $7 million. So the enhancement plainly applies.

[10] It is not clear from his brief if Reyes-Rivera is arguing that the district court should have granted a downward departure or a downward variance. These terms have different meanings. See United States v. Vega-Santiago, 519 F.3d 1, 3 (1st Cir. 2008) (en banc). Either way, we reject his claim.

U.S.S.G. § 5K1.1."[11] Though the parties acknowledged Reyes-Rivera's assistance in the plea agreement, § 5K1.1 is inapplicable. That provision states: "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1. Reyes-Rivera does not identify any motion from the government stating that he provided substantial assistance. Neither is there a mention of one in the sentencing transcript or in his sentencing memorandum. And on appeal, he raises no challenge to the government's decision not to file such a motion. See United States v. Mulero-Algarín, 535 F.3d 34, 38–39 (1st Cir. 2008).

He may be arguing that the district court should have considered, on the record, his assistance to the government and accordingly given him a lower sentence. See United States v. Pacheco, 727 F.3d 41, 47 (1st Cir. 2013) (recognizing government cooperation as section 3553(a) factor). This amounts to an argument that the district court did not properly consider the

---

[11] The government makes no attempt to respond to this argument in its brief. This, along with the government's two-sentence, perfunctory response to Reyes-Rivera's abuse of trust argument, compels us to repeat the warning issued in United States v. Villanueva Lorenzo, 802 F.3d 182, 187 n.5 (1st Cir. 2015): "The government risks losing a case it should not lose . . . with that kind of advocacy."

section 3553(a) factors. We reject the argument. The district court stated that it considered the section 3553(a) factors. See United States v. Madera-Ortiz, 637 F.3d 26, 31 (1st Cir. 2011) ("[T]he fact that the court stated that it had considered all the section 3553(a) factors is entitled to some weight." (quoting United States v. Dávila-González, 595 F.3d 42, 49 (1st Cir. 2010))). And after carefully reviewing the sentencing transcript, we are confident that the district court gave sufficient consideration to the section 3553(a) factors, and it did not err by not expressly stating on the record its consideration of Reyes-Rivera's assistance to the government. A district court need not verbalize its evaluation of each and every section 3553(a) factor. See Dávila-González, 595 F.3d at 49; United States v. Quiñones-Medina, 553 F.3d 19, 26–27 (1st Cir. 2009).

"Merely raising potentially mitigating factors does not guarantee a lesser sentence," Dávila-González, 595 F.3d at 49, and "having discretion to consider something does not entitle a defendant to force the district court to factor the issue being considered into its final decision," Pacheco, 727 F.3d at 48.

B.   Substantive Reasonableness

The substantive reasonableness of a sentence is reviewed, considering the totality of the circumstances, for abuse of discretion. United States v. Ruiz-Huertas, 792 F.3d 223, 226 (1st Cir. 2015). A sentence will stand so long as there is "a

- 18 -

plausible sentencing rationale and a defensible result." Martin, 520 F.3d at 96. The district court had plenty of reason to sentence as it did.

## 1. Disproportionality

Reyes-Rivera's first argument is that the district court erred by giving him a sentence that was, as he says, "grossly disproportionate" to the sentence that was given to his brother, Jeffrey, and to sentences given to defendants in cases he claims involved similar conduct.[12] See 18 U.S.C. § 3553(a)(6); see also United States v. Reyes-Santiago, 804 F.3d 453, 468 (1st Cir. 2015) (addressing claim under the rubric of substantive reasonableness).

Section 3553(a)(6) "is primarily aimed at national disparities, rather than those between co-defendants." United States v. Marceau, 554 F.3d 24, 33 (1st Cir. 2009). "Unless two 'identically situated defendants' receive different sentences from the same judge, which may be a reason for concern, our general rule of thumb is that a 'defendant is not entitled to a lighter sentence merely because his co-defendants received lighter sentences.'" United States v. Rivera-Gonzalez, 626 F.3d 639, 648

---

[12] Reyes-Rivera tries to characterize this as a procedural error, claiming the district court failed to consider the issue of disparity. See 18 U.S.C. § 3553(a)(6). But elsewhere in his briefing, he admits that "the court commented on the issue of disparity." Indeed, the court expressly asked defense counsel at sentencing to address the disparity issue raised in the sentencing memorandum.

(1st Cir. 2010) (quoting United States v. Wallace, 573 F.3d 82, 97 (1st Cir. 2009)).

Dilean Reyes-Rivera and Jeffrey were not identically situated. First, and most importantly, they pled guilty to different offenses. Reyes-Rivera pled guilty to both bank fraud and conspiracy to commit wire fraud, the first of which carries a maximum term of thirty years of imprisonment, see 18 U.S.C. § 1344. Jeffrey pled guilty only to conspiracy to commit wire fraud, which means that Jeffrey could not have been sentenced to more than the five-year statutory maximum permitted for that crime, see id. §§ 371, 1343. Second, as the district court found, Reyes-Rivera "was considered the leader, organizer of the criminal activity." Reyes-Rivera admitted that Jeffrey followed his instructions and that he never even explained the business to Jeffrey. The district court acted well within its discretion in giving Reyes-Rivera a harsher sentence than Jeffrey. See Reyes-Santiago, 804 F.3d at 467 ("We have routinely rejected disparity claims . . . because complaining defendants typically fail to acknowledge material differences between their own circumstances and those of their more leniently punished confederates.").

As to national disparity, Reyes-Rivera's sentencing memorandum briefly discussed three cases from the District of Puerto Rico and the Southern District of New York that he alleged were substantially similar to his case, each of which resulted in

a sentence of fifty-one months or fewer.  In response, the district

court stated:

> I will say that you have done an excellent job in raising the issue of disparity within the same districts.  I do know that the cases that you have cited involve perhaps huge amounts of money.  I don't know what the role of each one of those defendants was.  I don't know how persuasive the arguments or the background of this defendant was in terms of prognosis for rehabilitation, their entire background, how many people were effected [sic].

The district court plainly considered Reyes-Rivera's

section 3553(a)(6) argument, and it gave an adequate explanation

for why Reyes-Rivera's case "was not in the same camp" as those he

offered.  United States v. García-Ortiz, 792 F.3d 184, 192 (1st

Cir. 2015).[13]

2.   Upward Variance

Reyes-Rivera claims that the district court erred by

imposing a seven-month upward variance to account for the impact

that his Ponzi scheme had on his victims.  He claims that "the

conduct described to the Court by the various vocal victims was

---

[13]   Reyes-Rivera's brief on appeal simply "incorporates the arguments set forth and submitted in the sentencing memorandum." That does not work.  "Such an attempt to incorporate by cross-reference does not comport with our ordinary rule that claims made to this court must be presented fully in an appellate brief and not by cross-reference to claims made in the district court." Lawrence v. Gonzales, 446 F.3d 221, 226 (1st Cir. 2006); see also Fed. R. App. P. 28(a)(8).  "By failing to develop" this argument on appeal, Reyes-Rivera "has waived [his] claim."  Universal Ins. Co. v. Office of Ins. Comm'r, 755 F.3d 34, 38-39 (1st Cir. 2014).

already fully considered and calculated in the advisory guideline offense level, and the various enhancements recommended in the defendant's sentence guidelines calculation that was set forth in the plea agreement." He also makes a related second argument: "A close examination of the District Court's comments about the guidelines suggests that the sentencing judge saw the guidelines sentencing as a mandatory base-line from which the court was to steeply upwardly depart."[14]

The first argument fails. The district court gave a plausible and sensible rationale for placing particular weight on victim impact and correctly noted -- contrary to Reyes-Rivera's claim -- that certain aspects of victim impact are not expressly contemplated in the guidelines:

> Mr. Reyes made the victims believe that he was selling high yield investment products in retirement plans. Instead, he was basically aware that all of this was leading to a scheme. The victims were mostly retired employees, unemployed individuals, persons that basically disposed of whatever they had, including their houses, credit lines, in order to make these investments. . . .
>
> In general, most of . . . the victims mortgaged their properties, had to go back to work after being in retirement. Some of them have incurred in additional expenses, paying for psychiatric or psychological treatment.

_____

[14] It is not true that the district court "steeply upwardly depart[ed]." The district court, as we have found, correctly calculated the guidelines sentencing range to be 188 to 235 months. In sentencing Reyes-Rivera to 242 months, the district court only imposed a seven-month upward variance.

Some of them have attempted suicide. Some have suffered cardiac arrest and symptoms. . . .

The guidelines do factor in the characteristics of the crime, economic loss, the number of victims, but all of that that you heard about is not factored in. All those other expenses, it's not even factored in in the amounts that they are calculating for restitution purposes. And those are losses that they have experienced at this time.

The court also considered the "blatant disregard" manifested by Reyes-Rivera when he refused to return $5000 to an investor who needed the money to take care of a bedridden cancer patient. This explanation was more than adequate enough to justify the relatively minor seven-month variance.

The second argument is easily disposed of as well. Reading the sentencing transcript as a whole, it is obvious from statements in the record that the district court did not consider the guidelines to be a mandatory baseline.

3.   Overlapping Enhancements

Because the district court provided a plausible and sensible rationale for the sentence it imposed, we find no abuse of discretion in its decision not to adjust downward to counteract the effect of the various enhancements it correctly applied.

IV.

We affirm.

- 23 -