# United States Court of Appeals
## For the First Circuit

No. 17-1132

UNITED STATES OF AMERICA,

Appellee,

v.

MALIK DELIMA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Circuit Judge,
Souter, Associate Justice,*
and Kayatta, Circuit Judge.

Peter J. Cyr and Law Offices of Peter J. Cyr for appellant.
Michael J. Conley, Assistant United States Attorney, with
whom Halsey B. Frank, United States Attorney, was on brief, for
appellee.

March 26, 2018

---

* Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**LYNCH**, **Circuit Judge**.  Malik Delima pleaded guilty in 2016 to conspiring to commit access-device fraud after court-approved wiretaps, authorized during a separate investigation into a Vermont-based drug trafficking organization, exposed Delima's involvement in a scheme to produce and make purchases with fraudulent credit cards.  Delima appeals the district court's denial of his motion to suppress the wiretap evidence.  He also challenges his sentence on procedural and substantive reasonableness grounds.  We affirm.

## I. Background

A.  Facts

In 2014, federal law enforcement agents in Vermont began an investigation into a drug trafficking organization that transported cocaine and heroin from New York to Vermont and Maine.  As part of that investigation, the agents applied for and obtained three separate wiretap authorizations from the district court in Vermont.  The wiretaps targeted four phones used by Gary Delima and other members of the drug trafficking group.  Each of the three wiretap applications was supported by affidavits, on personal knowledge, from Drug Enforcement Administration agent Timothy Hoffmann, who participated in the investigation.  Through the wiretaps, the agents learned that Gary Delima and his brother Malik Delima ("Delima"), the defendant in this case, were at the center

of another criminal scheme -- one involving the manufacturing and use of fraudulent credit cards.

On March 24, 2015, law enforcement agents executed a search warrant at the apartment of one of Malik Delima's associates in Auburn, Maine. They recovered various equipment used to manufacture fraudulent credit cards, including a laptop computer, a credit-card-embossing machine (a "tipper"), a credit card laminator, a magnetic-strip card reader, approximately 210 prepaid gift cards, and approximately 150 credit and debit cards. They also seized a laptop that contained text files with hundreds of stolen credit card numbers. In total, 2,326 unique credit, debit, and gift card numbers were seized from the physical cards, the laptop's files, and email accounts associated with the laptop.

B. Presentencing Proceedings

Malik Delima moved to suppress all evidence obtained through the wiretaps on the ground that the government had failed to demonstrate necessity. The district court denied the request on June 21, 2016.

On July 22, 2016, Delima pleaded guilty to one count of conspiring to commit access-device offenses in violation of 18 U.S.C. §§ 1029(a)(1), (a)(3), (a)(4) and (b)(2).[1] Pursuant to

---

[1] Ten other individuals, including Gary Delima, were charged for their respective roles in the credit card scheme. Charges against two of the codefendants, Sabrina McNeil and

- 3 -

Federal Rule of Criminal Procedure 11(a)(2), Delima conditioned his guilty plea on the reservation of his right to appeal the district court's denial of his motion to suppress the wiretap evidence.

The probation office filed a presentence investigation report ("PSR"), which stated that Delima, along with his brother Gary, orchestrated the credit card scheme. It referred to phone calls showing that the two brothers oversaw nine other individuals who assisted in the execution of the scheme. The PSR also noted that, based on the 2,326 card numbers recovered from the seizure, and the formula specified in U.S.S.G. § 2B1.1, the total loss amount was $1,163,000 (2,326 cards multiplied by $500 per card).

The PSR calculated Delima's base offense level to be six. It then recommended a fourteen-level enhancement because the estimated loss was more than $550,000 and less than $1,500,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(H); a two-level enhancement because the offense involved possession of device-making equipment, pursuant to § 2B1.1(b)(11)(B)(i); a two-level enhancement because there were at least ten victims, pursuant to § 2B1.1(b)(2)(A)(i); a four-level enhancement because Delima was an organizer and/or leader of a criminal enterprise with five or more participants, pursuant to § 3B1.1(a); and a three-level

Destinee Theriault, were dismissed. The remaining eight codefendants pled guilty.

reduction for Delima's acceptance of responsibility, pursuant to § 3E1.1.  As such, the PSR determined that Delima had a total offense level ("TOL") of twenty-five.

Because Delima had a number of prior convictions, the PSR calculated that he had a criminal history category ("CHC") of IV.  Based on a TOL of twenty-five and a CHC of IV, the applicable guideline range was 84-105 months.  The PSR adjusted the range to 84-90 months because there was a statutory cap of ninety months' incarceration.  See 18 U.S.C. § 1029(b)(2).  Delima objected to three aspects of the PSR: the estimated loss amount, his role enhancement, and the two criminal history points associated with his Youthful Offender conviction.

C.    Loss-Amount Hearing and Sentencing Hearing

The district court held an evidentiary hearing to determine the loss amount on December 22, 2016.  Delima and two of his codefendants were present at the hearing.  At the outset, the government introduced, and the district court admitted without objection, a spreadsheet of the fraudulent credit card numbers that the government contended was a "conservative estimate" of the numbers attributable to the defendants, a summary narrative chronology, a transcript of jail calls, and transcripts of the wiretapped calls.

The government then called Secret Service Agent Matthew Fasulo to testify.  Fasulo, who joined the Delima investigation in

March 2015, described what he understood to be the mechanics of the credit card scheme: the conspirators purchased stolen credit card numbers from online sources, used specialized equipment to manufacture fraudulent credit cards, and recruited women to use the fraudulent credit cards to purchase goods and gift cards at retailers. Fasulo then testified that, based on the government's spreadsheet, approximately 1,024 of the credit card numbers recovered from the seizures in the apartment were tied to the conspiracy in the month of March 2015 alone.

Fasulo explained that, based on his review of the transcripts of the wiretapped calls, he believed that the scope of the criminal scheme extended beyond Maine to several other states, including Pennsylvania, Massachusetts, and New York. Fasulo discussed a number of the wiretapped calls in depth, including a call in which Delima instructed Gary to order 100 unique credit card numbers for $1,500; a call showing that Delima and his coconspirators had been ordering card numbers even before they had moved their operation to Maine; several calls in which Delima discussed recruiting women to make purchases with the fraudulent credit cards; a call in which Delima recommended Plattsburgh, New York as an attractive place to make purchases; and a call in which Delima advised Gary on where to test the fraudulent cards.

On cross-examination, Fasulo testified that there was no evidence directly tying the files found on the seized laptop to

Delima, and that only about half of the accounts listed in the government's spreadsheet had been confirmed by banks to be associated with real individuals.[2] On redirect examination, Fasulo confirmed that, based on his review of email accounts associated with both the sellers and the buyers of the fraudulent credit card numbers, none of the conspirators had complained that the card numbers purchased online were illegitimate.

The sentencing hearing took place on February 1, 2017. After hearing from the parties, the court addressed the two disputed issues: the loss amount and the role enhancement.

With respect to the loss amount, the district court noted that Delima had "agreed to be part of the entire process" of the conspiracy, pointing to defense counsel's own concessions that Delima "knew what was planned, knew how it would be done, knew when it would be done, . . . and knew the people who were going to do it." As such, the district court attributed "the 1,025 card[ numbers] that were found . . . in the [March 2015] raid" to Delima.[3] The court also found that a "minimum of 75" additional cards were attributable to Delima, "based on his operations in

---

[2] Fasulo testified that the other half had not been submitted to the banks for confirmation.

[3] The district court rejected Delima's assertion that only the card numbers that were actually used could be considered in the loss amount calculation, as well as his contention that some of the 1,025 card numbers recovered from the raid may have been fake.

other areas, and his personal operations previously in Maine." The court emphasized that seventy-five was a "minimum" figure, and that Delima was responsible for "probably hundreds" of card numbers in addition to the 1,025 recovered from the March 2015 search. Because the district court attributed at least 1,100 cards to Delima, it determined the loss amount to be "at least [$]550,000" and applied a fourteen-level loss enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(H).

With respect to the role enhancement, the district court acknowledged that Delima had "a considerable role in the offense," but ultimately decided to give him a three-level role enhancement as a "manager and supervisor" of the scheme, rather than a four-level enhancement as an organizer or leader. As a result of the court's findings on the two enhancements and the acceptance-of-responsibility reduction, Delima's total offense level was twenty-four. Combined with a CHC of III,[4] the applicable sentencing range was 63-78 months.

The district court ultimately imposed a seventy-five-month sentence. In doing so, the court emphasized the interstate, "broad-ranging" nature of the conspiracy; Delima's role as a "central character" in the scheme; his "troubled criminal history;" his involvement in the conspiracy within months of

---

[4] While the PSR recommended a CHC of IV, the district court adjusted it to III by agreement of the parties.

completing his supervised-release term from a prior counterfeiting conviction; the significant harm suffered by Maine residents; and the fact that the conspiracy "was only stopped fortuitously" by the March 2015 raid. The district court also stated that it would have given the same seventy-five-month sentence even if it had found 1,025 card numbers instead of 1,100.

## II. **Discussion**

On appeal, Delima challenges the district court's denial of his motion to suppress the wiretap evidence, as well as its decision to impose the fourteen-level loss enhancement and the three-level role enhancement. Delima also alleges that the district court's seventy-five-month sentence was substantively unreasonable.

A.   Denial of Motion to Suppress Wiretap Evidence

Under 18 U.S.C. § 2518(1)(c), wiretap applications must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." The government is not required to "run outlandish risks or to exhaust every conceivable alternative before seeking a wiretap." United States v. Hoffman, 832 F.2d 1299, 1306 (1st Cir. 1987). Rather, to satisfy § 2518(1)(c), the government must demonstrate that it "has made a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting

to means so intrusive as electronic interception of telephone calls." United States v. Rodrigues, 850 F.3d 1, 9 (1st Cir. 2017) (quoting United States v. Martinez, 452 F.3d 1, 4 (1st Cir. 2006)). In reviewing the district court's ruling with respect to the government's showing of necessity, we "decide if the facts set forth in the [wiretap] application were minimally adequate to support the determination that was made." United States v. Santana, 342 F.3d 60, 65 (1st Cir. 2003) (quoting United States v. López, 300 F.3d 46, 53 (1st Cir. 2002)).

We have upheld wiretap applications supported by affidavits that "explain[] why the continued use of traditional investigative techniques (such as confidential sources, grand jury subpoenas, search warrants, surveillance and consensual monitoring) would be ineffective in uncovering the full scope of the potential crimes under investigation." United States v. Villarman-Oviedo, 325 F.3d 1, 10 (1st Cir. 2003). We have also approved of affidavits in which "agents assert a well-founded belief that the techniques already employed during the course of the investigation had failed to establish the identity of conspirators, sources of drug supply, or the location of drug proceeds." Rodrigues, 850 F.3d at 10.

The affidavits supporting all three of the wiretap applications clearly set forth the goals of the investigation, which were to (1) identify the conspiracy's leaders; (2) ascertain

- 10 -

the names, phone numbers, and addresses of associates of the conspiracy, including drug suppliers, distributors, and customers; (3) determine the manner in which drugs were trafficked to and stored in Vermont; and (4) discover the methods used by the organization to funnel proceeds back to individual participants. Contrary to Delima's assertions, these goals were not overly broad. See Martinez, 452 F.3d at 6 (deeming valid, for wiretap-authorization purposes, similar investigatory goals).

The December 22, 2014 affidavit adequately stated why each of the ten traditional investigative techniques that had been employed up to that point would have been ineffective in achieving the goals of the investigation. For example, the affidavit stated that the use of confidential informants would have been fruitless because the informants were low-level "runners" who did not have access to information pertinent to the investigation's goals; that controlled drug purchases and pole cameras would not help to identify the leaders of the conspiracy; and that interviewing members of the conspiracy might compromise the investigation by alerting the suspects.

Like the December 22, 2014 affidavit, the February 3, 2015 affidavit properly described why additional wiretaps were needed to accomplish the investigation's goals and why traditional

investigative techniques would not suffice.[5]  It also explained that, while the December 22, 2014 wiretap had permitted agents to gain a better understanding of the conspiracy's operations, wiretaps on two additional phones were necessary to determine, inter alia, the organization's source for heroin and cocaine base, its trafficking and money-laundering methods, its use of firearms in furtherance of the conspiracy, and "the extent of the organization's distribution network in Maine and other places outside of Vermont."

At oral argument, defense counsel contended that even if the first two wiretaps were necessary, the third wiretap was not, because the agents already had a solid case against the Vermont drug traffickers by the time they applied for that wiretap.  We disagree.  Like the February 3, 2015 affidavit, the affidavit supporting the February 23, 2015 wiretap application provided updated reasons as to why new wiretaps were necessary and why traditional investigative techniques were still unlikely to be effective.  Importantly, the February 23, 2015 affidavit articulated why the newly requested wiretap would provide the agents with information "beyond what was acquired through the

---

[5]     Moreover, the February 3, 2015 affidavit did not merely recite the reasoning from the December 22, 2014 affidavit.  To the contrary, its explanation of (1) why another wiretap was needed and (2) why traditional investigative techniques were still insufficient was supported by fresh examples and new evidence uncovered since the December 22, 2014 application.

monitoring of the previous phones alone."  In particular, the affidavit noted that the third wiretap application targeted a phone that members of the conspiracy used for internal communications, whereas prior wiretaps had primarily targeted phones used by the suspects to communicate with customers.  According to Hoffmann, wiretapping an internal phone would, unlike previous wiretaps, provide information regarding when drug supplies were being trafficked to Vermont, the quantity of those drugs, and where those drugs would be hidden prior to distribution.  That information clearly falls within the parameters of the investigation's legitimate goals.  See id. at 6.

In short, each of the three affidavits provided facts that were "minimally adequate" to support the wiretap authorizations.  Santana, 342 F.3d at 65 (quoting López, 300 F.3d at 53).

B.    Sentencing Challenges

We review the district court's sentencing decisions, apart from claimed errors of law, for abuse of discretion.  See United States v. Clogston, 662 F.3d 588, 590 (1st Cir. 2011).  We engage in a two-part analysis: "we first determine whether the sentence imposed is procedurally reasonable and then determine whether it is substantively reasonable."  Id.

A district court's sentencing decision is procedurally unreasonable if the district court "fail[s] to calculate (or

improperly calculat[es]) the Guidelines range, treat[s] the Guidelines as mandatory, fail[s] to consider the § 3553(a) factors, select[s] a sentence based on clearly erroneous facts, or fail[s] to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range." United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008) (quoting Gall v. United States, 552 U.S. 38, 51 (2007)). A sentence is substantively reasonable if, "considering the totality of the circumstances, . . . there is 'a plausible sentencing rationale and a defensible result.'" United States v. Reyes-Rivera, 812 F.3d 79, 89 (1st Cir. 2016) (quoting Martin, 520 F.3d at 96).

Delima alleges that the district court committed procedural error by imposing a fourteen-level loss enhancement and a three-level role enhancement. He also asserts that his seventy-five-month sentence is substantively unreasonable because a downward variance was warranted. We reject these arguments for the following reasons.

1.   Loss Enhancement

Under U.S.S.G. § 2B1.1(b)(1)(H), criminal conduct that causes a "loss" of more than $550,000 but less than $1,500,000 gives rise to a fourteen-level increase in the defendant's offense level. As an initial matter, to the extent Delima asserts that the district court should have focused on the actual losses caused by the conspiracy, which he claims amounted to somewhere between

- 14 -

$11,000 and $30,000, he misconstrues the Guidelines' definition of "loss."

U.S.S.G. § 2B1.1 cmt. n.3(A) defines "loss" as the "greater of actual loss or intended loss," where "actual loss" represents the "reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" represents "the pecuniary harm that the defendant purposely sought to inflict," including "intended pecuniary harm that would have been impossible or unlikely to occur." For cases involving counterfeit access devices, the Guidelines state that "loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $500 per access device." Id. at cmt. n.3(F)(i).[6]

It is clear from the record that the district court focused on intended losses and rejected Delima's argument that actual losses should be used. Delima's actual-loss argument ignores the fact that, under U.S.S.G. § 2B1.1, a "sentencing court must consider the greater of actual or intended loss." United States v. Iwuala, 789 F.3d 1, 12-13 (1st Cir. 2015) (emphasis added). Delima and his conspirators clearly procured credit card numbers with the intention of using all of the numbers to generate

_____

[6] Delima advances no argument that the $500 per device floor specified in U.S.S.G. § 2B1.1 cm.t n.3(F)(i) is not applicable when intended loss is used as the measure.

- 15 -

profits, even if they did not end up actually using all of the numbers. In fact, as the district court noted, a primary reason why the conspirators were unable to use the remaining numbers was because federal agents put a halt to the conspiracy by raiding the Auburn apartment. As such, the district court correctly focused its inquiry on how many card numbers the conspiracy procured, regardless of actual use.

Our next task is to determine the extent of the loss the conspiracy intended to cause. The government bears the burden of proving the amount of intended loss by a preponderance of the evidence. See United States v. Alli, 444 F.3d 34, 38 (1st Cir. 2006). "[D]eference is owed" to the loss determination of the district court, which "need only make a reasonable estimate of the loss," because the district court "is in a unique position to assess the evidence and estimate the loss based on that evidence." United States v. Sharapka, 526 F.3d 58, 61 (1st Cir. 2008) (quoting U.S.S.G. § 2B1.1, cmt. n.3).

Defendants who engage in a "jointly undertaken criminal activity" are responsible for (1) losses that are "directly attributable" to them, and for (2) losses that result from "reasonably foreseeable acts committed by others in furtherance of the jointly undertaken criminal activity." United States v. Pizarro-Berríos, 448 F.3d 1, 8 (1st Cir. 2006). The sentencing court must first "ascertain what activity fell within the scope of

- 16 -

the specific conduct and objectives embraced by the defendant's agreement," and then "determine to what extent others' acts and omissions that were in furtherance of jointly undertaken criminal activity likely would have been foreseeable by a reasonable person in defendant's shoes at the time of his or her agreement." United States v. LaCroix, 28 F.3d 223, 227 (1st Cir. 1994).

The district court properly found that Delima had agreed to be "an integral member" of a conspiracy to procure misappropriated credit card numbers, produce fraudulent credit cards, and use the fraudulent cards to transact with merchants. There was also ample evidence for the district court to conclude that Delima was aware of even the "smallest detail[s]" of the conspiracy. Wiretapped conversations revealed that Delima had funded and profited from the conspiracy, had been aware of the role of each actor in the conspiracy, and had understood the minute operational details of the conspiracy, including the appropriate size of card-number orders and how to effectively test the fraudulent credit cards. As such, the district court reasonably found that all 1,025 of the credit card numbers procured by the conspiracy in March 2015 were foreseeable to Delima. See LaCroix, 28 F.3d at 229 (holding that "a defendant's awareness of the inner workings of a conspiracy in which he is participating . . . frequently will suffice to prove the defendant's ability to foresee the acts of coconspirators").

- 17 -

Delima argues that there was no evidence of his involvement in the conspiracy before late February 2015, and that he should not be responsible for any losses associated with card numbers outside of the 1,025 numbers attributable to the conspiracy in March 2015. However, several wiretapped calls evidenced that Delima had been personally involved in credit card fraud in Maine and other states well before March 2015. For example, during a call on February 26, 2015, Delima described Plattsburgh as a "beautiful" location to make purchases with fraudulent cards because there were a significant number of "reggies" (i.e., cash registers) there. In another call on March 6, 2015, Delima stated that his conspirators needed to "pay homage" to him when they travelled to the Lewiston-Auburn area to await delivery of a tipper because that area was "[his] town." And in several other phone calls, Delima referred to his preexisting connections to women who were willing to make purchases with fraudulent credit cards. Given this evidence, the district court reasonably found it probable that a minimum of seventy-five additional card numbers were personally attributable to Delima.

The government conceded at oral argument that the district court was required to attribute at least seventy-six, not seventy-five, additional card numbers to Delima in order to apply the fourteen-level enhancement under U.S.S.G. § 2B1.1(b)(1)(H). Moreover, seventy-six is only the correct figure if we accept the

- 18 -

district court's finding, which defense counsel failed to contest at sentencing, that 1,025 card numbers were attributable to the conspiracy in March 2015, even though Fasulo testified that there were "approximately 1,024" March 2015 numbers. However, these discrepancies -- which cumulatively account for only two card numbers -- do not amount to prejudicial error because the district court stated that, based on the evidence of Delima's prior personal involvement in credit card fraud, Delima was responsible for "probably hundreds" of numbers in addition to the 1,025 numbers that the district court attributed to the conspiracy in March 2015.[7]

Delima also argues that some of the card numbers recovered from the March 2015 search may have been fabricated. Not only is there a complete lack of evidence to support this assertion, but the district court also reasonably relied on affirmative evidence of the card numbers' genuineness. That evidence included the fact that the conspirators repeatedly purchased the numbers from the same source without complaint, and the fact that the affected banks checked approximately half of the recovered numbers and confirmed that all of those numbers were associated with real accounts. The district court reasonably

---

[7] Moreover, the district court noted that it would have given the same sentence even if it had attributed only 1,025 numbers to Delima.

reached the conclusion that the card numbers recovered from the March 2015 seizure were genuine.

### 2.   Role Enhancement

We review the district court's determination that Delima was a "manager or supervisor" of the conspiracy for clear error. United States v. Garcia-Hernandez, 659 F.3d 108, 114 (1st Cir. 2011).  U.S.S.G. § 3B1.1(b) provides for a three-level enhancement "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive."  A court applying this enhancement must make two findings: first, "that the underlying criminal activity involved five or more participants or was otherwise extensive," and second, "that the defendant, when committing the offense, managed, superintended, or exercised hegemony over at least one other participant."  United States v. Nuñez, 840 F.3d 1, 5 (1st Cir. 2016), cert. denied, 137 S. Ct. 1126 (2017).

Delima does not challenge the district court's finding that the conspiracy involved five or more participants.  His challenge focuses instead on the extent of Delima's authority over other participants in the conspiracy.

Despite Delima's attempts to downplay his role, the district court had sufficient evidence to find that Delima exercised significant authority over his coconspirators.

Wiretapped calls evidenced Delima's authority to make operational and strategic decisions concerning the conspiracy, including decisions regarding how many card numbers to order, when to acquire vehicles to carry out the scheme, where to send lower-ranking personnel, and who to recruit to make purchases. As such, it was not clear error for the district court to conclude that Delima "managed, superintended, or exercised hegemony over at least one other participant" in the conspiracy, Nuñez, 840 F.3d at 5, and consequently that he was a "manager or organizer" under § 3B1.1(b).

3.    Substantive Reasonableness of the Seventy-Five-Month Sentence

Finally, Delima challenges his seventy-five-month sentence on substantive reasonableness grounds. Because that sentence is within the Guidelines range, Delima "bears the 'heavy burden' of marshaling 'fairly powerful mitigating reasons and persuad[ing] us that the district judge was unreasonable.'" United States v. Carpenter, 781 F.3d 599, 622 (1st Cir. 2015) (quoting United States v. Madera-Ortiz, 637 F.3d 26, 30 (1st Cir. 2011)).

Delima makes the unpersuasive argument that he should have been granted a downward variance because of the disparity between the actual losses caused by the conspiracy and the foreseeable losses attributed to him. As we noted above, the district court's reasonable calculation of the loss amount properly focused on intended -- not just actual -- losses

associated with the conspiracy. Actual losses were lower than intended losses because federal agents seized the conspirators' equipment and inventory, preventing the conspirators from profiting from the remaining numbers. That does not mitigate the severity of Delima's criminal conduct.

Moreover, the district court identified several aggravating factors that justified imposing a sentence at the high end of the Guidelines range: the conspiracy was "broad-ranging" and crossed state lines; Delima had been convicted of a number of crimes in the past, including robbery and counterfeiting currency; Delima dove right into the credit card scheme just months after the conclusion of his supervised-release term; the conspiracy caused significant, "far-ranging" harm to Maine residents, including banks, credit card holders, and merchants; and the conspiracy "was only stopped fortuitously" by the March 2015 apartment raid. These factors provided the district court with "a plausible sentencing rationale," which it used to arrive at a "defensible result." Reyes-Rivera, 812 F.3d at 89 (quoting Martin, 520 F.3d at 96). Delima's sentence was not substantively unreasonable.

### III. Conclusion

Delima's conviction and sentence are affirmed.